629 A.2d 1334

## FIRST AMERICAN BANK OF MARYLAND

v.

## Rufus W. SHIVERS.

**No. 1903, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Sept. 3, 1993.

J. Mark Coulson (Mark D. Gately, David M. Feitel and Miles & Stockbridge, on the brief), Baltimore, for appellant.

Edgar T. Bellinger (Yvonne Ramos Neitz and Zuckert, Scoutt & Rasenberger, on the brief), Washington, DC, for appellee.

Argued before MOYLAN and HARRELL, JJ., and ROSALYN B. BELL,* Judge (Retired), Specially Assigned.

HARRELL, Judge.

This appeal presents a statutory interpretation question of first impression in Maryland: In what manner must a bank provide notice of the effective date of its merger with another bank to a shareholder who has objected to that merger, so

---

* Bell, J., now retired, participated in the hearing and decision of this case while an active member of this Court; after being recalled pursuant to the Constitution of Maryland, Art. IV, sections 3A and 18(b), she also participated in the adoption of this opinion.

that the shareholder may timely exercise his statutory right to receive the fair market value of his shares?

## I

The Financial Institutions Article of the Annotated Code of Maryland contains specific provisions governing mergers of banks. Section 3–719 of the article sets forth the procedures that a stockholder who objects to an approved merger must follow to perfect his right to fair value of his shares:

§ **3–719. Right to fair value.**

(a) *General rule.*—The owner of shares of stock that were voted against a consolidation, merger, or transfer of assets is entitled to receive the fair value of those shares, in cash, if the transaction becomes effective.

(b) *Procedure by stockholder.*—A stockholder who desires to receive payment of the fair value for shares under this section, within 30 days after the transaction becomes effective, shall:

(1) Make a written demand on the successor for payment; and

(2) Surrender the stock certificates.

Md.Fin.Inst.Code Ann. § 3–719 (1992).[1] The Financial Institutions Article is silent on the questions of who is to give bank shareholders notice of a merger's effective date and in what manner such notice is to be given.

The Maryland General Corporation Law,[2] on the other hand, not only imposes specific duties on objecting stockholders with regard to exercising their statutory rights generally, but also provides clear directions to a successor corporation with regard to providing notice of the event that triggers the

---

1. Hereinafter, citations to the Financial Institutions Article shall be in the following form: FI § ___.

2. This body of law is comprised of Titles 1, 2, and 3 of the Corporations and Associations Article of the Annotated Code of Maryland. Md. Corps. & Ass'ns Code Ann. § 1–103 (1993). Citations to the Corporations and Associations Article in this opinion shall appear as: CA § ___.

time period within which the stockholders may exercise those rights.   The relevant sections provide as follows:

### § 3–203.   Procedure by stockholder.

(a) *Specific duties.*—A stockholder of a corporation who desires to receive payment of the fair value of his stock under this subtitle:

.     .     .     .     .

(3) Within 20 days after the [State Department of Assessments and Taxation] accepts the [articles of merger] for record, shall make a written demand on the successor for payment for his stock, stating the number and class of shares for which he demands payment.

.     .     .     .     .

### § 3–207.   Notice and offer to stockholders.

(a) *Duty of successor.*—(1) The successor promptly shall notify each objecting stockholder in writing of the date the articles are accepted for record by the Department.

(2) The successor may also send a written offer to pay the objecting stockholder what it considers to be the fair value of his stock. . . .

(b) *Manner of sending notice.*—The successor shall deliver the notice and offer to each objecting stockholder personally or mail them to him by certified mail, return receipt requested, bearing a postmark from the United States Postal Service, at the address he gives the successor in writing, or, if none, at his address as it appears on the records of the corporation which issued the stock.

CA §§ 3–203 & –207.   With these statutes in mind, we turn to the case *sub judice.*

II

The material facts are not in dispute.   On or about 29 March 1988, First American Bank of Maryland (First American or the Bank), appellant, entered into a merger agreement with FABM Acquisition Bank.   The proposal was constructed with First American as the surviving, or successor, bank.   On

25 May 1988, Rufus W. Shivers (the Shareholder), appellee, voted by proxy his 1178 shares of First American common stock against the proposed merger. His objection was to no avail, however, as he and his fellow dissentients comprised less than the number of the Bank's shareholders needed to defeat the proposal. The merger was approved on 14 June 1988.

Some time in August 1988 the Bank sent, by regular mail, a "Notice of Effective Date of Merger" to its shareholders. The notice was dated 8 August 1988 but there is no evidence as to when the notice was actually mailed. The notice informed the shareholders that the merger was approved on 14 June and became effective on 8 August. The notice also stated that objecting shareholders who did not perfect their "dissenter's rights" would be entitled to receive only the amount offered by the Bank for each share of First American stock. Finally, the notice directed shareholders who had voted against the merger and desired to perfect their dissenter's rights to follow the procedures set forth in FI § 3–719. By perfecting dissenter's rights within the thirty-day time frame indicated in that section, an objecting shareholder can elect to receive the appraised fair value of the shares rather than accept the dollar amount per share offered by the successor bank. The offered price per share was $42.00. The fair market value of the Bank's shares was eventually determined to be $55.00 per share.

The thirty-day period in the instant case began on 8 August 1988 and ended on 7 September 1988. The Shareholder, however, was away from his Alexandria, Virginia home on out-of-town trips for over half of those thirty days. On 11 August, he embarked on a thirteen-day business trip to several locations around the country; he returned home on 23 August. He left again on 2 September to oversee rental property that he owned in Delaware. He returned home from that trip on 6 September. He opened and read the 8 August 1988 Notice of Effective Date of Merger on 8 September, one day after the statutory time period ended. In his answers to the Bank's interrogatories in this litigation, the Shareholder explained that his two out-of-town trips and the large quantity of mail

that accumulated during those trips contributed to the delay in discovering the 8 August 1988 notice. His answers further explained the circumstances surrounding his receipt of the merger notice:

> I was out of town from the morning of August 11, 1988 until the night of August 23, 1988 and again from the afternoon of September 2 to the evening of September 6, 1988, for a total of 18 days.

> I get a tremendous amount of mail.... In fact, due to the volume of mail I receive, when I return from a trip, especially a 13 day trip, it takes 4 or 5 days for the mail carrier to deposit all of this mail into a 3″ by 4″ mail box in the apartment house. In the meantime, more mail is being received.

> .     .     .     .     .

> In August 1991 I was on a 5 day trip returning August 13, 1991. I kept track of the mail I received over the next 12 days including one Sunday. I received 129 pieces of mail including 61 pieces of first class mail.

> This gives an idea of the volume of mail that was on hand over the days immediately after arriving on August 23, 1988, then leaving again on September 2 and returning September 6, 1988.

> .     .     .     .     .

> After returning September 6, I went through the remaining mail on hand and the new mail received, and on September 8th I opened the First American letter advising me of the merger. On September 9th I called First American to advise the bank I had just received the merger notice and wrote a follow up letter dated September 9th advising the bank of this fact.

> I have a savings and checking account with First American. In 1988 I also had a Master Charge with First American. I receive a voluminous amount of mail from First American.

The merger notice was in a plain white envelope with a plain white label address and had no significant marks to indicate it contained important or time limited data inside.

The Shareholder read the notice on the evening of 8 September. The next morning, he called the office of the Bank's corporate secretary, Nancy R. Lewis, whose name and number appeared on the notice. Because Ms. Lewis was not in her office, the Shareholder spoke to an unidentified woman. He explained to this person the circumstances surrounding his discovery of the merger notice, his status as a dissenting shareholder, and his desire to inform Ms. Lewis of these facts. Later that day, the Shareholder sent a letter addressed to Ms. Lewis, explaining the events leading to his discovery of the notice and expressing his desire to maintain his dissenter's rights. He added that his stock certificates were then being used as security for a loan, but that he would immediately take action to obtain them.

One week later, the Shareholder spoke to Ms. Lewis by telephone to restate his position as a dissenting shareholder and explain again the reason for his delay in perfecting his dissenter's rights. On 21 and 26 September 1988, however, the Shareholder received letters from the Bank's president, Paul G. Adams, III, denying his requests for fair value for his shares.

The Shareholder filed a complaint against the Bank in the Circuit Court for Montgomery County on 8 August 1991. He sought to be included among the Bank's list of objecting stockholders who had perfected their dissenter's rights and to receive the fair value for his shares. The Shareholder based his claim on the Bank's failure to send the merger notice via certified mail pursuant to CA § 3–207(b), which, he asserted, applied to bank mergers by way of FI § 1–201. The latter section provides:

### § 1–201. Applicability of Maryland General Corporation Law.

Except as expressly provided by this article, the Maryland General Corporation Law applies to a financial institution and to all of its corporate acts.

The parties filed cross-motions for summary judgment. In its motion, the Bank relied on, among other things, CA § 1–102(d)(1), which provides:

### § 1–102. Applicability and construction of article.

. . . . .

(d) *Inconsistency between article and provisions relating to particular classes of corporations; exception.*—(1) To the extent that any provision of the Code which relates to a specific class of corporations conflicts with a general provision of this article, the specific provision governs.

The Bank argued that the Financial Institutions Article contained specific provisions that prevailed over the Corporations and Associations Article, rendering CA § 3–207 inapplicable.

The case came on for hearing on 7 October 1992. After taking the matter under advisement, the circuit court (Harrington, J.) issued its written decision on 8 October 1992. Observing that §§ 3–718 to –721 of the Financial Institutions Article govern the rights of objecting bank stockholders, the court identified two elements that it believed were critical to the exercise of dissenter's rights. First, it recognized that FI § 3–719(b) sets forth the procedure that a dissenting shareholder must follow to perfect his or her rights and emphasized that the thirty-day period in which a shareholder must act does not begin until the merger becomes effective. Second, the court opined that "[d]ue process would dictate that the bank would provide" the notice of the merger's effective date. In the court's view, without knowledge of the effective date, "a shareholder would be unaware that the clock had begun to run on the time available to exercise rights."

The circuit court then proceeded to determine the manner in which a bank must notify shareholders of the merger's effective date. Rejecting the Bank's contention that the absence in the Financial Institutions Article of specific procedures for the manner of giving notice to objecting sharehold-

ers permits a bank to use any means to give such notice, the court found the answer to its question in FI § 1–201. The court then noted that CA § 3–207(b) sets forth the manner of notice that a corporation must use to notify dissenting stockholders of the date of the event that triggers the statutory period within which such stockholders must take action to perfect their rights.[3] Applying this section by way of FI § 1–201, the lower court held:

> ... [T]he Plaintiff did not receive notice consistent with the Code. The requirement for notice by certified mail is designed to prevent a shareholder's inadvertent waiver of rights. It is common sense that an individual would take special notice of a communication that required his signature upon receipt. The Court recognizes the valid interest of the State in protecting shareholders while refraining from unduly burdening business. Adhering to the Md.Fin.Inst. Code Ann. while harmonizing the Md.Corps. and Assoc.Code Ann. when necessary achieves this purpose.

By order dated 27 October 1992, the court granted the Shareholder's motion for summary judgment, denied the Bank's motion for summary judgment, and awarded the Shareholder $64,790.00 plus prejudgment interest from 14 June 1988 and post-judgment interest.[4] The Bank appealed on 16 November 1992.

### III

Both parties agree that the question before us is one of law and that the dispute between them is appropriate for summary judgment. We agree. In support of its contention

---

**3.** The triggering event is the acceptance of the successor corporation's articles of merger by the State Department of Assessments and Taxation. CA § 3–203(a)(3).

**4.** The amount awarded reflects the appraised $55.00 per share price for each of the Shareholder's 1178 shares. The award of prejudgment interest from 14 June 1988 is based on FI § 3–720(a), which states that "[t]he fair value of the shares of stock shall be determined as of the date of the stockholders' meeting approving the consolidation, merger, or transfer of assets."

that the circuit court erred in applying CA § 3–207 to a bank merger governed generally by the Financial Institutions Article, the Bank presents several arguments. We address each one in turn.

A

The Bank's first argument is simple: There is no certified mail requirement in the merger provisions of the Financial Institutions Article, §§ 3–701 to –721. In the Bank's view, these provisions set forth a statutory scheme that is self-contained and completely separate from that found in the Corporations and Associations Article (sometimes hereinafter referred to as the Corporations Article). As support for that assertion, the Bank refers not to the Financial Institutions Article itself, but rather to a provision of the Corporations Article. As indicated earlier, CA § 1–102(d)(1) directs that when a provision relating to a specific class of corporations conflicts with a general provision of the Corporations Article, the specific provision will govern. According to the Bank, FI § 3–719, which relates specifically to bank mergers, conflicts with CA § 3–207, which is part of the general corporation law. Thus, the Bank asserts, § 3–719 governs and, because it is silent on what manner of notice a bank must use to notify shareholders, it does not require a bank to use certified mail.

The Bank also refers us to several other sections that it contends demonstrate that the merger provisions of the Corporations Article are not intended to apply automatically to bank mergers and that the bank merger laws are self-contained. For example, FI § 3–713 governs the effect of a transfer of assets, and states, "Consummation of a transfer of assets has the effects provided in § 3–115 of the Corporations and Associations Article." The Bank posits that if the provisions of the Corporations Article automatically applied to bank mergers then § 3–713's specific incorporation of CA 3–115 would be unnecessary. As an additional example, the Bank points to FI § 3–708(c), which states that a merger must be approved by the affirmative vote of two-thirds of the stockholders. CA § 3–105 contains the exact same requirement.

If, the Bank inquires, the provisions of the Corporations Article "are to be construed as instant gap-fillers" in the Financial Institutions Article, why did the identical requirement need to be stated in both articles?

Although we agree with the Bank's assertion that the bank merger provisions of the Financial Institutions Article represent the General Assembly's separate treatment of this particular class of corporations, we disagree that these provisions are self-contained and not governed in any respect by the general corporation law. We believe, as did the circuit court, that the plain language of FI § 1–201 compels the conclusion that CA § 3–207(b) requires a bank to use personal delivery or certified mail as the manner of sending notice of the effective date of a merger to the bank's shareholders.

■ Both this Court and the Court of Appeals have frequently stated that the cardinal rule of statutory construction is to ascertain and effectuate legislative intent. *Abramson v. Montgomery County, Md.,* 328 Md. 721, 736, 616 A.2d 894 (1992); *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md. App. 145, 165, 620 A.2d 356 (1993). In this endeavor, "the key is the purpose of the legislation, determined in the light of the statute's language and context." *Leppo v. State Highway Admin.,* 330 Md. 416, 422, 624 A.2d 539 (1993). Thus, our beginning point is the plain language of the statute itself, for this language is the legislature's final expression of its intended goal. *Morris v. Prince George's County,* 319 Md. 597, 603, 573 A.2d 1346 (1990); *Yost v. Early,* 87 Md.App. 364, 379, 589 A.2d 1291, *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991). If the statutory language sufficiently expresses the legislative purpose, we need look no further. *Yost,* 87 Md.App. at 379–80, 589 A.2d 1291.

The plain language of FI § 1–201 undermines the Bank's arguments. The import of the section's words is clear: The Maryland General Corporation Law, CA §§ 1–101 to 3–709, applies to all of a financial institution's corporate acts unless some provision in the Financial Institution Article *expressly* provides otherwise. The Bank concedes that the Financial

Institutions Article is silent regarding the manner of notice that a bank must use to notify a dissenting stockholder. (In fact, that article, unlike the Corporations Article, *see* § 3–207(a), is also silent on the question of who has the duty to notify objecting stockholders of the event that triggers the statutory period for exercising their rights; however, no one, including the Bank, has disputed that a merging bank or the successor bank has that duty in the context of bank mergers.) Such silence on an issue does not equate to a conclusion that the provision expressly addresses that issue. In addition, the Bank does not dispute that a bank's sending of notice of the effective date of a merger to dissenting shareholders is a "corporate act" by a financial institution. It follows from these premises, then, that, because the Financial Institutions Article does not expressly provide the manner of notice with which a bank must notify objecting shareholders of a merger's effective date, one must look to the Corporations Article for the acceptable or required manner of notice. CA § 3–207(b), via FI § 1–201, offers two options: personal delivery and certified mail. In the instant case, the Bank employed neither of those methods.

### B

Interestingly, the Bank constructed its analysis of the present issue around CA § 1–102(d)(1) despite observing in its brief that this provision "mirrors" FI § 1–201. Nevertheless, whether the issue is viewed through the spectacles of FI. § 1–201 or the contact lens of CA § 1–102(d)(1), the conclusion is the same.

CA § 1–102(d)(1) bears repeating here:

(d) *Inconsistency between article and provisions relating to particular classes of corporations; exception.*—(1) To the extent that any provision of the Code which relates to a specific class of corporations conflicts with a general provision of this article, the specific provision governs.

The Bank's emphasis on this section relies on its assertion that silence in the Financial Institutions Article in the face of

an articulated provision in the Corporations Article amounts to a conflict for purposes of applying the section. The Bank's sole authority for this proposition is *Burke v. Fidelity Trust Co.*, 202 Md. 178, 96 A.2d 254 (1953). In that case, stockholders of a bank who objected to a merger desired to exercise their dissenter's rights. They argued that the merger provisions then applicable to corporations in general, Md.Ann.Code art. 23, § 69 (1951), should govern over the merger provisions then applicable to banks, Md.Ann.Code art. 11, § 113 (1951), because the latter provisions were unconstitutional on several grounds. One asserted ground was the fact that § 69 specified that a judgment in favor of a stockholder must include interest from the date of the stockholders' meeting, whereas section 113 was silent on that matter. In dismissing section 113's silence on the issue of interest as immaterial, the Court of Appeals surmised: "If we assume, without deciding, that interest is not allowable under Section 113, the Legislature evidently considered the strict time limitation [within which an appraisal of the fair value of the dissenters' shares must be made] as a fair substitute. Interest, as such, plays no part in the valuation, and its allowance was probably designed to impose a penalty for undue delays." *Burke*, 202 Md. at 187, 96 A.2d 254.

The Bank seizes on this language to argue that the Court concluded that silence on the issue of interest equated with disallowance of interest because such a disallowance "fit logically within the companion merger provisions" set forth in section 113. "That is," the Bank continues, "the self-sufficient nature of these bank merger provisions taken as a whole negated any need to look elsewhere in the Annotated Code of Maryland in interpreting the [Article 11]." We believe that such an interpretation is too generous. Aside from the fact that there is no indication that the *Burke* Court was interpreting a provision equivalent to CA § 1–102(d)(1) and that the Court itself observed that the matter of interest is a collateral issue that "plays no part in the [issue of] valuation," we decline for another reason to adopt the Bank's argument. Even assuming that *Burke* stands for the position urged by the

Bank, the General Assembly has since directed, by the plain and unambiguous language of FI § 1–201, that when the Financial Institutions Article does not expressly speak to a matter, i.e., when it is silent on the matter, then one must look to the Corporations Article for the law on that matter.[5] Section 1–201 has been part of the Financial Institutions Article since the article was enacted. *See* 1980 Md. Laws ch. 33, § 2. Its inclusion in the article evidences the legislature's intent that the bank merger provisions are not to be considered self-sufficient and do not negate the need to look elsewhere in the Maryland Code in interpreting dissenting shareholders' rights.

## C

The Bank offers a few other arguments, none of which gives us any pause. First, referring again to the *Burke* decision, it

---

5. In a prior decision, this Court also observed that the Maryland General Corporation Law should apply where the law governing a specific class of corporations was silent on a particular matter. In *Langhoff v. Michael E. Marr, P.C.*, 81 Md.App. 438, 568 A.2d 844 (1990), *vacated and remanded*, 322 Md. 657, 589 A.2d 470 (1991), we endeavored to determine whether the dissolution of a professional corporation of lawyers should be governed by partnership law or corporate law for the purpose of deciding whether a departing attorney owed a fiduciary duty to the remaining entity. We observed (1) that § 5–107 of the Maryland Professional Service Corporation Act, CA §§ 5–101 to –122, stated that "[a] professional corporation has perpetual existence until dissolved in accordance with Title 3 of this article[,]" and (2) that CA § 1–102(a) applied the Corporations Article to every Maryland corporation and all of their corporate acts except where expressly provided otherwise. From these observations, we concluded that "[i]t appears to be fundamental that where the Professional Service Corporation Act is silent, the general corporate law should apply[,]" and that the dissolution at issue would be governed by general corporate law. 81 Md.App. at 455–56, 568 A.2d 844.

In vacating our decision and remanding the case, the Court of Appeals stated that it was not necessary to decide whether the partnership model or the corporate model applied because under either analysis the departing attorney owed no fiduciary duty to the remaining entity. *Michael E. Marr, P.C. v. Langhoff*, 322 Md. 657, 667, 589 A.2d 470 (1991). The Court neither approved nor disapproved our conclusion regarding the applicability of the general corporate law. Thus, despite the ultimate disposition of the case, our conclusion in *Langhoff* remains persuasive dictum.

contends that the Court of Appeals has endorsed the view that bank mergers warrant separate statutory treatment. The *Burke* shareholders argued that section 113 was unconstitutional because it was a special law passed to address an area "for which provision has been made, by an existing General Law," in violation of Md.Const. art. III, § 33. The Court rejected this contention and observed:

> That the business of banking bears such a relation to the economic security of the public as to be a legitimate subject of regulation by the State in the exercise of its police power, and of separate treatment, by classification not plainly unreasonable or arbitrary, needs no elaboration.

*Burke*, 202 Md. at 184, 96 A.2d 254. As indicated earlier, we do not dispute the proposition that bank regulation, and specifically bank mergers, are proper subjects for separate statutory treatment by the General Assembly. It does not follow *a fortiori*, however, that such statutory treatment is self-contained and requires no reference to other laws. The legislature's enactment of FI § 1–201 makes this perfectly clear.

Second, the Bank directs our attention to the absence of a certified mail requirement in the federal counterparts to Maryland's bank merger provisions, which, it asserts, are closely modeled after the federal laws. *See* 12 U.S.C. §§ 214a(a) & (b) (1988). Our attention so directed, we are unpersuaded that the alleged similarity between the merger provisions of federal law and Maryland law compels us to overlook the clear mandate of FI § 1–201.

Lastly, the Bank attaches much significance to the General Assembly's explicit providing of special notice requirements in other parts of the Financial Institutions Article. For example, FI § 3–803(c)(3) directs that after bank stockholders have approved a voluntary dissolution the bank's board of directors must notify the bank's creditors of the dissolution by publishing notice of the action each week for eight consecutive weeks in a newspaper that is published in the county where the bank has its principal banking office. Similarly, FI § 5–604 states

that if the Bank Commissioner takes possession of a bank, the Commissioner must notify each person who has any asset of the bank and notify the general public by publishing the notice in an appropriate newspaper. According to the Bank, the presence of these sections indicates that where the General Assembly has desired to provide specific notice requirements in the Financial Institutions Article it has so provided. Relying again on FI § 1–201, we disagree. We could, perhaps, undertake to ascertain the legislature's reasons for specifying notice procedures in certain parts of the Financial Institutions Article while omitting them in other parts, and to draw conclusions from those apparent reasons. Such an exercise, though, would probably be fruitless and, in light of FI § 1–201, is pointless. FI § 1–201 functions as a catch-all provision that directs a bank, a shareholder, or any other user of these laws to the Corporations Article when the Financial Institutions Article does not expressly provide for any given corporate act. The fact that the Financial Institutions Article expressly provides the procedure for some corporate acts in certain contexts does not alter or diminish the effect of FI § 1–201.

### D

In sum, we hold that, pursuant to FI § 1–201 and CA § 3–207(b), a bank must notify its objecting shareholders of the effective date of an approved merger by delivering the notice personally or mailing it by certified mail, return receipt requested. This conclusion follows seamlessly and naturally from the plain and unambiguous language of FI § 1–201. It also affords the same protection to dissenting shareholders of a bank that is given to dissenting shareholders of an ordinary corporation. Absent an express directive to the contrary from the legislature, we see no basis for differentiating between such similar classes of dissenting stockholders with regard to the protection of their dissenter's rights. Objecting shareholders of a merging corporation clearly are entitled to be notified, in a specified manner, of the date of the event—the acceptance by the State Department of Assessments and

Taxation of the articles of merger—that triggers the running of the period within which such shareholders must perfect their statutory rights. We believe that, in the absence of any statute or other law providing otherwise, dissenting shareholders of a merging bank are entitled to the same notice, in the same specified manner, of the analogous triggering event—the date the merger becomes effective.

We buttress our holding by observing that the Maryland General Corporation Law appears to be the foundation on which the law governing not only financial institutions but also other classes of corporations is erected. This is particularly so in the context of mergers. *See, e.g.,* CA § 4A–705(b) (limited liability companies; procedures under CA Title 3, Subtitle 2 are applicable to rights of objectors); CA § 5–107 (professional service corporations; "[a] professional corporation has perpetual existence until dissolved in accordance with" CA Title 3); CA 5–207(b) (nonstock corporations; merger of a nonstock corporation "shall be effected as provided in" CA Title 3); CA § 5–527(b) (agricultural cooperatives; a member objecting to a merger "has the same rights with respect to his contract and property rights as an objecting stockholder has with respect to his stock under" CA Title 3, Subtitle 2). Thus, while certain classes of corporations are proper subjects for separate regulation by the legislature, sections such as FI § 1–201 and those just listed are evidence that such separate schemes are not intended to, and cannot, be self-sufficient.

## IV

In an alternative argument, the Bank suggests that, even if it was required to notify the Shareholder pursuant to CA § 3–207(b), the use of certified mail would serve no useful purpose under the facts of this case. The Bank argues that certified mail was not needed to prove delivery of the notice because the Shareholder admitted that he actually received the notice of the effective date of the merger. The Bank also contends that the Shareholder possessed other information that should have alerted him that the effective date of the

merger was imminent and that informed him that the merger had in fact become effective, thus rendering reliance on certified mail unnecessary. In the Bank's view, the Shareholder had adequate notice of the relevant date because the Shareholder: (1) admitted that he expected the merger to be approved as early as March 1988; (2) admitted that he received and read proxy materials that set forth the steps to take in order to dissent from the merger; (3) received a 20 June 1988 letter from a law firm, Hogan & Hartson, describing the procedures that a dissenting shareholder must follow to perfect his rights; (4) admitted that he received in his accumulated mail a letter dated 12 August 1988 from Hogan & Hartson that indicated that the merger became effective on 8 August 1988; and (5) stated at his deposition that he otherwise rarely received correspondence from attorneys, making the Hogan & Hartson letter likely to stand out even more from a casual glance of accumulated mail. The Bank also contends that to rule in favor of the Shareholder in this case would be to reward his "lack of diligence" in opening the mail that accumulated during his out-of-town trips.

We begin our analysis of this argument by reducing it to its essence: The Bank maintains that the certified mail requirement is a technical requirement with which the failure to comply will not render the notice given ineffective where the recipient actually received notice of the relevant transaction. There is authority elsewhere that the actual receipt of a notice sent by regular mail is valid even though a statute required the use of registered mail. *See Crummer v. Whitehead,* 230 Cal.App.2d 264, 40 Cal.Rptr. 826, 829 (1964). Moreover, Maryland has recognized that "while failure to comply with the statutory requirements of notice may sometimes be fatal (jurisdictionally), the requirement of notification purposed to inform may be satisfied by proof of actual notice; this is especially true when the knowledge has been acted upon without reliance upon the defects in the notice." *State v. Barnes,* 273 Md. 195, 210, 328 A.2d 737 (1974). *See also Clark v. Wolman,* 243 Md. 597, 600, 221 A.2d 687 (1966); *Hill v. W.E. Brittain, Inc.,* 405 S.W.2d 803, 807 (Tex.Civ.App.1966)

(statutory requirement that notice be sent by registered or certified mail is waived if the person to be notified actually receives the notice and is not prejudiced by the failure to follow the strict requirement of the statute). *See generally* 58 Am.Jur.2d *Notice* § 34 (1989).

The defect in the Bank's argument is that the Shareholder did not receive actual notice of the effective date of the merger until after the statutory period had run. It is undisputed that the Shareholder actually opened the 8 August 1988 notice from the Bank on the evening of 8 September 1988, one day after the statutory period ended. Moreover, the Shareholder cannot be deemed to have been charged with actual knowledge by virtue of the first three of the above-mentioned circumstances that the Bank contends somehow informed the Shareholder that the merger's effective date was imminent. These events failed to apprise the Shareholder of the one piece of information that he needed to begin taking the proper steps for perfecting his dissenter's rights. More significant given the procedural posture of this case, the Bank failed to generate a genuine dispute of the material fact established by the Shareholder that he did not have actual notice of the effective date until it was too late to act. *See Bond v. NIBCO, Inc.,* 96 Md.App. 127, 135, 623 A.2d 731 (1993) (once movant sets forth sufficient grounds for summary judgment, party opposing summary judgment must show with some particularity that there is a genuine dispute as to a material fact).

In addition, Hogan & Hartson's 12 August 1988 did not provide the Shareholder with adequate notice of the effective date; like the Bank's notice, the law firm's notice was not opened and read by the Shareholder until after 7 September. Moreover, the Bank's argument—that because the Shareholder admittedly received little mail from attorneys, the Hogan & Hartson letter should have flagged the Shareholder's attention—actually argues in favor of the use of certified mail. The Shareholder stated in his answers to interrogatories that the 8 August 1988 notice arrived in an ordinary white envelope with no significant marks or words that made the letter stand out from the crowd. An envelope sent by certified mail, of course,

is an entirely different beast. As the circuit court indicated, "It is common sense that an individual would take special notice of a communication that required his signature upon receipt." We share this view. A requirement that notice of a transaction be mailed by certified mail, return receipt requested, not only serves the evidentiary purpose of proving delivery, but it also flags the notice being sent, setting the envelope apart from its brethren and indicating to the addressee that this particular piece of mail deserves special attention.

Technical or not, the requirement of certified mail is mandated by CA § 3–207(b). The breach of this requirement renders the given notice ineffective. *Cf. First Mortgage Bond Homestead Ass'n v. Baker*, 157 Md. 309, 313–14, 145 A. 876 (1929) (stockholders who attend a corporate meeting cannot complain that notices of the meeting were not mailed to them in the manner prescribed by statute); *Tompkins v. Sperry, Jones & Co.*, 96 Md. 560, 580, 54 A. 254 (1903) (same). For that reason, the Shareholder's alleged lack of diligence is of no moment. He did not receive notice consistent with the requirements of the Maryland Code. Accordingly, we affirm the circuit court's grant of summary judgment in the Shareholder's favor.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.